# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSUCHUSETTS

|  |  |
|---|---|
| JEAN BATTY; EDWARD RUSSO; MATT WOLF; PAUL P. BARNETT; CRAIG VACCA; and COMMONWEALTH SECOND AMENDMENT, INC., | ) ) ) ) ) )  CIVIL ACTION NO. ) 1:15-cv-10238-FDS |
| Plaintiffs, | ) ) |
| -against- | ) ) |
| KEN ALBERTELLI, in his official Capacity as Chief of the Winchester Police Department; and WILLIAM TAYLOR, in his Official Capacity as Superintendent of the Lowell Police Department, | ) ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

   
## TABLE OF CONTENTS

STATUTORY BACKGROUND ............................................................................................... 1

   A.  An LTC is Needed to Possess or Carry a Handgun Anywhere in Massachusetts .............. 1

   B.  LTC Issuance and Restrictions ......................................................................... 2

FACTUAL BACKGROUND .................................................................................................. 3

   A.  Plaintiffs Jean Batty and Edward Russo ........................................................... 3

   B.  Defendant's Policy and Practice ....................................................................... 4

ARGUMENT ................................................................................................................... 6

(I)    THE SECOND AMENDMENT SECURES THE RIGHT TO CARRY GUNS FOR SELF-DEFENSE ...... 6

   A.  *Heller*'s Holdings ......................................................................................... 6

      1.  *The Right to "Bear" Arms is the Right to Carry Weapons* ............................... 7

      2.  *The "Core" of the Second Amendment is Personal Protection* ....................... 7

   B.  *Heller*'s Discussion of Presumptively Lawful Restrictions and Concealed Carry ............. 8

      1.  *Restrictions the Court Deemed "Presumptively Lawful"* ................................ 9

      2.  *Concealed Carry* ........................................................................................ 10

(II)   FIRST CIRCUIT JURISPRUDENCE AND THE STANDARD OF REVIEW ...................................... 13

(III)  DEFENDANT'S POLICY OF IMPOSING "TARGET & HUNTING" RESTRICTIONS
       VIOLATES THE RIGHT OF ARMED SELF-PROTECTION ......................................................... 15

   A.  The "Target & Hunting" Restriction is a Severe Burden ................................. 16

      1.  *Comparison with Heller's Presumptively Lawful Restrictions* ....................... 16

      2.  *Analogous Laws* ........................................................................................ 17

      3.  *Historical Authorities* .................................................................................. 17

   B.  Defendant's Policy Does Not Further Important Governmental Interests ....................... 18

      1.  *A Burden Must Further a Governmental Interest that is (at least) "Important"* .......... 18

      2.  *Defendant's Policy is Not Adequately Related to Public Safety* ..................... 19

CONCLUSION ................................................................................................................. 20

**T**ABLE OF **A**UTHORITIES

<u>**C**ASES</u>

<u>Andrews v. State</u>, 50 Tenn. 165 (1871) .................................................................. 12, 18

<u>Aymette v. State</u>, 21 Tenn. 154 (1840)........................................................................ 12

<u>Caetano v. Massachusetts</u>, 136 S. Ct. 1027 (2016)..................................................... 6, 8

<u>Commonwealth v. Powell</u>, 459 Mass. 572, 964 N.E.2d 114 (2011) ............................. 2

<u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008)............................................ *passim*

<u>Doughty v. Underwriters at Lloyd's</u>, 6 F.3d 856 (1st Cir. 1993) ................................... 6

<u>Drake v. Filko</u>, 724 F.3d 426 (3d Cir. 2013) ............................................................... 20

<u>Ezell v. Chicago</u>, 651 F.3d 684 (7th Cir. 2011)........................................................... 19

<u>Grace v. District of Columbia</u>, no. 15-2234, 2016 U.S. Dist. LEXIS 64681
  (D.D.C. May 17, 2016) .......................................................................................... 20

<u>Heller v. District of Columbia</u>, 670 F.3d 1244 (D.C. Cir. 2011) ("<u>Heller II</u>")............ 10

<u>Hightower v. Boston</u>, 693 F.3d 61 (1st Cir. 2013) .................................................. 13-16

<u>In re Brickey</u>, 70 P. 609, 8 Idaho 597 (1908) .............................................................. 18

<u>In re McIntyre</u>, 552 A.2d 500 (Del. Super. Ct. 1988) .................................................. 17

<u>Jackson v. City & County of San Francisco</u>, 746 F.3d 953 (9th Cir. 2016) ................. 10

<u>Kunz v. New York</u>, 340 U.S. 290 (1951) ...................................................................... 20

<u>Lakewood v. Pillow</u>, 501 P.2d 744, 180 Colo. 20 (1972)............................................. 18

<u>Las Vegas v. Moberg</u>, 485 P.2d 737, 82 N.M. 626 (App. Ct. 1971) ........................... 18

<u>McCoy v. MIT</u>, 950 F.2d 13 (1st Cir. 1991).................................................................... 9

<u>McDonald v. Chicago</u>, 561 U.S. 742 (2010) ............................................................... 6-9

<u>Moore v. Madigan</u>, 702 F.3d 933 (7th Cir. 2012)................................................... 16, 19

<u>Nunn v. State</u>, 1 Ga. 243 (1846) ......................................................................... 10-12, 18

<u>Parker v. District of Columbia</u>, 478 F.3d 370, 374, 384-86 (D.C. Cir. 2007),
  aff'd sub nom. <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008)...................... 7-8

<u>Powell v. Tompkins</u>, 783 F.3d 332 (1st Cir. 2015) ...................................................... 13

<u>Rossiter v. Potter</u>, 357 F.3d 26 (1st Cir. 2004) .......................................................... 6, 9

<u>Seminole Tribe of Fla. v. Florida</u>, 517 U.S. 44 (1996)................................................... 6

<u>Shuttlesworth v. Birmingham</u>, 394 U.S. 147 (1969) ................................................... 20

<u>Smith v. Mass. Bay Transp. Auth.</u>, 462 Mass. 370, 968 N.E.2d 884 (2012)................ 3

<u>State ex rel. Princeton v. Buckner</u>, 377 S.E.2d 139, 180 W. Va. 457 (1988).............. 18

<u>State v. Buzzard</u>, 4 Ark. 18 (1842) ............................................................................. 18

<u>State v. Chandler</u>, 5 La. Ann. 489 (1850)............................................................. 11-12, 17

<u>State v. Jumel</u>, 13 La. Ann. 399 (1858) ...................................................................... 18

<u>State v. Reid</u>, 1 Ala. 612 (1840)............................................................................. 12, 17

<u>United States v. Armstrong</u>, 706 F.3d 1 (1st Cir. 2013) ......................................... 13-14, 18

<u>United States v. Booker</u>, 644 F.3d 12 (1st Cir. 2012).......................................... *passim*

<u>United States v. Carter</u>, 752 F.3d 8 (1st Cir. 2014) ................................................... 14

United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006) ...................................... 9

United States v. Marzzarella, 614 F.3d 85 (3d Cir. 2010) ........................................... 10

United States v. Miller, 307 U.S. 174 (1939) ............................................................. 8

United States v. Rehlander, 666 F.3d 45 (1st Cir. 2012) ............................................. 9

United States v. Rene E., 583 F.3d 8 (1st Cir. 2009) ........................................... *passim*

United States v. S. Union Co., 630 F.3d 17 (1st Cir 2010)........................................... 9

United States v. Skoien, 614 F.3d 638 (7th Cir. 2010) (en banc)................... 14-15, 18-19

United States v. Smoot, 690 F.3d 215 (4th Cir. 2012)................................................ 10

United States v. Torres-Rosario, 658 F.3d 110 (1st Cir. 2011) .................................... 9

United States v. Williams, 616 F.3d 685 (7th Cir. 2010) ........................................... 10

## STATUTES

18 U.S.C. § 922 .................................................................................................... 13-14

Ala. Code § 13A-11-75 ........................................................................................... 17

Alaska Stat. § 18.65.700 ......................................................................................... 17

Ariz. Rev. Stat. § 13-3112 ....................................................................................... 17

Ark. Code Ann. § 5-73-309 ..................................................................................... 17

Cal. Penal Code § 26150 ......................................................................................... 17

Cal. Penal Code § 26200 ......................................................................................... 17

Colo. Rev. Stat. Ann. § 18-12-203 .......................................................................... 17

Conn. Gen. Stat. § 29-32b ....................................................................................... 17

11 Del. Code Ann. § 1441 ....................................................................................... 17

11 Del. Code Ann. § 1442 ....................................................................................... 17

Fla. Stat. Ann. § 790.06 .......................................................................................... 17

Ga. Code Ann. § 16-11-129 ..................................................................................... 17

Haw. Rev. Stat. § 134-9 .......................................................................................... 17

Idaho Code Ann. § 18-3302 ..................................................................................... 17

30 Ill. Comp. Stat. 66/10 ......................................................................................... 17

Ind. Code Ann. § 35-47-2-3 ..................................................................................... 17

Iowa Code Ann. § 724.7 .......................................................................................... 17

Kan. Stat. Ann. § 75-7c03 ....................................................................................... 17

Ky. Rev. Stat. Ann. § 237.110 ................................................................................. 17

La. Rev. Stat. Ann. § 40:1379.3 .............................................................................. 17

25 Me. Rev. Stat. Ann. § 2001-A ............................................................................ 17

Md. Code Ann., Pub. Safety § 5-306 ....................................................................... 17

Md. Code Ann., Pub. Safety § 5-307 ....................................................................... 17

1998 Mass. Acts ch. 180 ....................................................................................... 2-3

2014 Mass. Acts ch. 284 .......................................................................................... 3

M.G.L. c. 140, § 121 ............................................................................................. 1, 3

M.G.L. c. 140, § 129B .............................................................................................. 2

M.G.L. c. 140, § 129C ............................................................................................... 2

M.G.L. c. 140, § 131 ............................................................................................... 2-4

M.G.L. c. 140, § 131P ............................................................................................... 2

M.G.L. c. 269, § 10 ................................................................................................... 1

Mich. Comp. Laws Ann. § 28.422 ......................................................................... 17

Minn. Stat. § 624.714 ............................................................................................. 17

2016 Miss. H.B. 786 ............................................................................................... 17

Mo. Ann. Stat. § 571.101 ....................................................................................... 17

Mont. Code Ann. § 45-8-321 .................................................................................. 17

Neb. Rev. Stat. § 69-2430 ...................................................................................... 17

Nev. Rev. Stat. Ann. § 202.3657 ........................................................................... 17

N.H. Rev. Stat. Ann. § 159.6 ................................................................................. 17

N.J. Stat. Ann. § 2C:58-4 ....................................................................................... 17

N.M. Stat. Ann. § 29-19-4 ..................................................................................... 17

N.Y. Penal L. § 400.00 ........................................................................................... 17

N.C. Gen. Stat. § 14-415.11 ................................................................................... 17

N.D. Cent. Code § 62.1-04-03 ............................................................................... 17

Ohio Rev. Code Ann. § 2923.125 .......................................................................... 17

21 Okla. Stat. Ann. § 1290.12 ............................................................................... 17

Or. Rev. Stat. Ann. § 166.291 ............................................................................... 17

18 Pa. Cons. Stat. Ann. § 6109 ............................................................................. 17

R.I. Gen. Laws § 11-47-11 ..................................................................................... 17

S.C. Code Ann. § 23-31-215 .................................................................................. 17

S.D. Codified Laws § 23-7-7 .................................................................................. 17

Tenn. Code Ann. § 39-17-1351 .............................................................................. 17

Tex. Gov't Code § 411.177 ..................................................................................... 17

Utah Code Ann. § 53-5-704 .................................................................................... 17

Va. Code Ann. § 18.2-308 ...................................................................................... 17

Wash. Rev. Code Ann. § 9.41.070 ......................................................................... 17

W. Va. Code Ann. § 61-7-3 .................................................................................... 17

Wis. Stat. § 175.60 ................................................................................................. 17

Wyo. Stat. Ann. § 6-8-104 ..................................................................................... 17

## OTHER AUTHORITIES

Brian MacQuarrie, "Want a gun license in Massachusetts?  Much depends on where
   you live," Boston Globe (Mar. 10, 2013) .............................................................. 2

James Kent, Commentaries on American Law (O. Holmes ed., 12th ed. 1873) .......... 11

The American Students' Blackstone (G. Chase ed. 1884) .......................................... 11

The constitutional right "to keep and bear Arms" protects "the individual right to possess *and carry* weapons in case of confrontation," and the "core lawful purpose" of the right is self-defense. United States v. Rene E., 583 F.3d 8, 11 (1st Cir. 2009) (quoting District of Columbia v. Heller, 554 U.S. 570, 592, 630 (2008)) (emphasis added). But in Winchester, the ability to bear arms for this core purpose turns on Defendant Chief Albertelli's determination that an individual has a "reason to fear" that is, in his view, adequate. In the absence of such an adequate "reason," Defendant issues Licenses to Carry Firearms ("LTC's") with "Target & Hunting" restrictions that preclude the bearing of arms for defensive purposes.

Defendant's policy impermissibly infringes the Second Amendment right to bear arms. Part I shows that the Supreme Court's holdings establish that the right to bear arms is the right to carry weapons, including modern handguns, and to do so for the core purpose of personal protection. Part II then reviews decisions from the Court of Appeals for the First Circuit for guidance on the standard of review. Finally, Part III applies this standard of review to show that Defendant's policy is incompatible with the Second Amendment. The enshrinement of a constitutional right necessarily eliminates "the power to decide on a case-by-case basis whether the right is really worth insisting upon." Heller, 554 U.S. at 634 (emphasis omitted).

## STATUTORY BACKGROUND

### A) An LTC is Needed to Possess or Carry a Handgun Anywhere in Massachusetts

Different parts of the Massachusetts General Laws impose different, sometimes overlapping, gun license requirements. First, subpart (a) of M.G.L. c. 269, § 10 makes the "possession" of a handgun (not a rifle or shotgun) a crime unless a person is "present in or on his residence or place of business" or holds an LTC. See M.G.L. c. 269, § 10(a)(1)-(2); see also M.G.L. c. 140, § 121 ("firearm" definition). However, subpart (h) then criminalizes the possession of any handgun, rifle, or shotgun—at any location—without either an LTC or a

Firearms Identification Card ("FID").  <u>See</u> M.G.L. c. 269, § 10(h)(1); <u>see also</u> M.G.L. c. 140, §

129C.  Finally, as the result of a 1998 amendment to a different statute, an FID "shall not entitle

a holder thereof to possess:  (i) a large capacity firearm . . . ; or (ii) a non-large capacity firearm."

M.G.L. c. 140, § 129B(6); <u>see also</u> 1998 Mass. Acts ch. 180, § 29.  All handguns are either

"large capacity" and "non-large capacity," so this means an FID does not allow the possession of

<i>any</i> type of handgun.  Confusion has arisen when courts have cited pre-1998 authorities.  <u>See,</u>

<u>e.g.</u>, <u>Commonwealth v. Powell</u>, 459 Mass. 572, 587-88, 964 N.E.2d 114, 128 (2011).

### B)  LTC Issuance and Restrictions

An individual seeking an LTC must apply from a designated "licensing authority," which

is generally the Police Chief for the person's residence or place of business.  <u>See</u> M.G.L. c. 140,

§§ 121, 131(d).  An applicant must meet various requirements and pass a fingerprint-based

background check.  <u>See</u> <u>id.</u> § 131(d)-(e).  An applicant must also complete a firearms safety

course.  <u>See</u> <u>id.</u> § 131P(a).  These requirements are not at issue in this case.

The issue here is the statutory authority to issue LTC's "subject to such restrictions

relative to the possession, use or carrying of firearms as the licensing authority deems proper."

<u>Id.</u> § 131(a).  Defendant relied on this authority to impose "Target & Hunting" restrictions on the

LTC's he had issued to Plaintiffs.  A person who violates an LTC restriction faces suspension or

revocation and a fine of up to $10,000.  <u>See</u> <u>id.</u>  There is no law that specifies the activities that

LTC restrictions allow.  Furthermore, restriction policies vary widely, with some Police Chiefs

routinely issuing unrestricted LTC's to qualified applicants, while others rarely or never do so.[1]

From 1998 through 2014, Massachusetts law allowed Police Chiefs to issue a limited or

"Class B" LTC that, unlike a "Class A" LTC, did not allow a person to:  (1) "carry or possess a

---

[1] <u>See</u> Brian MacQuarrie, "Want a gun license in Mass.? Much depends on where you live," <u>Boston Globe</u> (Mar. 10, 2013), <u>available at</u> <u>http://archive.boston.com/news/local/massachusetts/2013/03/10/want-gun-license-massachusetts-much-depends-where-you-live/04SFWtTEpGdtEHm5mTQuSO/singlepage.html</u> (last visited Jul. 8, 2016).

loaded firearm in a concealed manner in any public way or place;" or (2) possess a "large

capacity firearm."[2]  See 1998 Mass. Acts ch. 180, sec. 41, § 131(a)-(b), codified as amended at

M.G.L. c. 140, § 131(a)-(b).  In 2014, the General Court passed legislation that ended the

practice of issuing "Class B" LTC's and phased out existing "Class B" licenses.  See generally

2014 Mass. Acts ch. 284, sec. 46, 101.  The 2014 Act provided that, effective immediately,[3] no

"licensing authority . . . shall issue, renew or accept application for a Class B license to carry."

Id. sec. 101.  Previously issued Class B LTC's will remain in effect until they expire, or until

July 31, 2020 at the latest.  See id.  The Act deletes remaining statutory references to "Class A"

and "Class B" on January 1, 2021.  See id. sec. 24, 46, 60, 68, 71, 91, 112.

## FACTUAL BACKGROUND

### A)  Plaintiffs Jean Batty and Edward Russo

Plaintiffs are two private citizens who applied for and obtained unrestricted LTC's in

June 2013.  In early 2015, Defendant re-issued their LTC's with "Target & Hunting" restrictions.

Plaintiff Jean Batty is a married mother of three who lives in Scituate and works for

MassHealth.  Plfs. 56.1[4] ¶¶ 1-2.  She applied for an LTC from Defendant on March 24, 2013,

when she lived in Winchester.  Id. ¶ 3.  On the portion of the application form that requested her

"Reason(s) for requesting the issuance of a card or license," she wrote, "All lawful purposes.

Personal protection and self defense."  Id. ¶ 5.  Defendant issued Ms. Batty a "Class A" LTC

with no restrictions on June 5, 2013.  Id. ¶ 6.

Plaintiff Edward Russo is a married, retired man with 3 children and 8 grandchildren who

now lives in South Yarmouth.  Id. ¶¶ 7-8.  He applied for an LTC from Defendant on March 20,

---

[2] Essentially, any semiautomatic handgun that is "capable of accepting" a magazine that can hold more than 10 rounds of ammunition.  See M.G.L. c. 140, § 121.

[3] The act's emergency preamble makes its provisions effective immediately, unless another day is set.  See generally Smith v. Mass. Bay Transp. Auth., 462 Mass. 370, 377, 968 N.E.2d 884, 891 (2012).

[4] Plaintiffs' Statement of Material Facts as to Which There is No Genuine Issue to be Tried, submitted herewith.

2013, when he lived in Winchester.  Id. ¶ 9.  On the portion of the application form that requested his "Reason(s) for requesting the issuance of a card or license," he wrote, "all lawful purpose personal protection."  Id. ¶ 11.  Defendant issued Mr. Russo a "Class A" LTC with no restrictions on June 5, 2013.  Id. ¶ 12.

In January 2015, a representative of Defendant contacted both Ms. Batty and Mr. Russo and advised them that their LTC's has been "issued without the approved Target and Hunting Restriction as originally directed by the Chief of Police."  Id. ¶ 13.  Defendant's representative directed both Plaintiffs to return their current, unrestricted LTC's and to pick up LTC's with this restriction.  Id. ¶ 14.  On January 21, 2015, Plaintiff Jean Batty and her husband submitted a letter to Defendant requesting that he re-issue them unrestricted LTC's and citing specific reasons that both had to be concerned for their safety.  Id. ¶¶ 15-16.  Defendant denied the request.  Id. ¶ 17.  Ms. Batty exchanged her LTC on January 26, 2015.  Id. ¶ 18.  Mr. Russo did so on February 5, 2015.  Id. ¶ 19.

Both Plaintiffs sought and continue to seek licenses that would allow them the option to carry handguns for personal protection while away from their homes.  Id. ¶ 20.  Both Plaintiffs would complete reasonable additional training in order to obtain unrestricted LTC's.  Id. ¶ 21.

**B)  Defendant's Policy and Practice**

Defendant is the "licensing officer" that M.G.L. c. 140, § 131 vests with authority to issue LTC's in the Town of Winchester.  Plfs. 56.1 ¶ 22.  Defendant's current practice is to personally review each LTC application and determine whether to impose a restriction.  Id. ¶ 23.  Defendant uses the "Target & Hunting" restriction and also the "Employment" restriction combined with either "Target & Hunting" or "Sporting."  Id. ¶ 24.  Under Defendant's written firearms licensing policy, adopted in February 2016, a "Target and Hunting" restriction allows

target shooting and hunting, and also allows "personal protection in the home," collecting, and travel to and from activity locations.  Id. ¶¶ 25-26.  Neither it nor any other restriction that Defendant uses authorizes personal protection away from their home.[5]

From January 1, 2014 through March 23, 2016, Defendant issued a total of 252 LTC's, consisting of 140 new licenses and 112 renewals.  Id. ¶ 29.  Defendant issued most of new LTC's with restrictions, while he issued most of the renewals without restrictions.  Defendant issued unrestricted LTC's to only 13 new applicants who were not law enforcement officers (9.3%).  Id. ¶¶ 29-30.  Defendant imposed a "Target & Hunting" restriction on 94 (67.1%), and he imposed combined "Employment" and "Target & Hunting"/"Sporting" restriction on 31 (22.1%).  Id. ¶¶ 29, 31-32.  Overall, 89.3% of new LTC's have restrictions.  In contrast, Defendant issued 106 of the renewal LTC's without restrictions (94.6%).  Id. ¶¶ 29, 33.  Defendant issued five renewals with "Target & Hunting" restrictions (4.5%) and one with combined "Employment" and "Target & Hunting"/"Sporting" restrictions (0.9%).  Id. ¶¶ 29, 34-35.

Defendant's written policy references Defendant's statutory authority to impose restrictions, states that "[e]very [LTC] will specifically state the use and purpose," and provides that for new LTC applicants, "a detailed description of the purpose for the application must be provided.  ('All lawful purposes' is not sufficiently specific)."  Otherwise, the written policy provides no guidance regarding when Defendant will impose a restriction.  Id. ¶ 36.

Defendant testified that a person seeking an unrestricted LTC must provide a "reason to fear," rather than a "feeling of fear."  Id. ¶ 37.  Defendant cited documented victims of assault and harassment as examples, as well as members of occupations that involve a "constant" risk of

---

[5] A "Sporting" restriction allows possession during various outdoor activities and, similarly, "personal protection in the home," collecting, and travel to activity locations.  Plfs. 56.1 ¶ 27.  An "Employment" restriction "[r]estricts possession to [a] business owner engaged in business activities or to an employee while engaged in work related activities, and maintaining proficiency, where the employer requires carrying a firearm."  Id. ¶ 28.

danger.  Id. ¶ 38.  Defendant also testified that there "could" be other adequate "reasons to fear,"

aside from occupation or past victimization.  Id. ¶ 39.  But when asked to identify considerations

that would justify an unrestricted LTC, Defendant testified only that applicants needed to "me[e]t

the criteria of the law."  Id. ¶ 40.  Defendant testified he would not provide applicants with

advice about considerations that would make him more likely to grant an unrestricted LTC.  Id. ¶

41.  There are no written criteria that govern Defendant's decision.  Id. ¶ 42.  Licensure in a prior

state would not make Defendant more likely to issue an unrestricted LTC.  Id. ¶ 43.  While

training is "a consideration," it was not part of the criteria that Defendant applies.  Id. ¶ 44.

## ARGUMENT

### (I)   THE SECOND AMENDMENT SECURES THE RIGHT TO CARRY GUNS FOR SELF-DEFENSE

#### A.  Heller's Holdings

The Second Amendment protects "the right of the people to keep and bear Arms."  U.S.

Const. amend. II.  The Supreme Court's decision in Heller—re-affirmed in McDonald v.

Chicago, 561 U.S. 742 (2010) and Caetano v. Massachusetts, 136 S. Ct. 1027 (2016)—

establishes both that the right "to keep and bear Arms" protects the right "to possess and carry

weapons in case of confrontation," Heller, 554 U.S. at 592, and that self-defense is the "the

*central component* of the right itself," id. at 599 (emphasis in source); see also Rene E., 583 F.3d

at 11.  Both of these issues—the meaning of the right to "bear arms," and the purpose that it

serves—are antecedent holdings because "deleting [them] would have impaired the analytical

foundation of the Court's ultimate decision."  Doughty v. Underwriters at Lloyd's, 6 F.3d 856,

861 (1st Cir. 1993); see also Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 67 (1996); Rossiter

v. Potter, 357 F.3d 26, 31 (1st Cir. 2004).

### 1.   *The Right to "Bear" Arms is the Right to Carry Weapons*

The bulk of <u>Heller</u>'s analysis is in Part II's interpretation of the words of the Second Amendment.  <u>See</u> <u>Heller</u>, 554 U.S. at 576-626.  The Court dedicated 9 pages of this Part to interpreting the meaning of the right to (specifically) "bear" arms.  <u>See</u> <u>id.</u> at 584-92.  The Court concluded that "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'  When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose— confrontation."  <u>Id.</u> at 584 (quotations and citations omitted).

The meaning of the right to "bear arms" had always been central to <u>Heller</u>.  The District Court had concluded that "bear" was a military term involving no right to arms unconnected to military service, and the Court of Appeals had reversed this (specific) conclusion.  <u>See</u> <u>Parker v. District of Columbia</u>, 478 F.3d 370, 374, 384-86 (D.C. Cir. 2007), <u>aff'd sub nom.</u> <u>Heller</u>, 554 U.S. 570.  The Supreme Court's conclusion that the right to "bear" arms was the right to "carry" them, for either personal or military reasons, underpinned its rejection of the arguments of the District of Columbia and the dissent that the Second Amendment protected the keeping and bearing of arms only for use in an organized militia.  <u>See</u> <u>Heller</u>, 554 U.S. at 586-92.

### 2.   *The "Core" of the Second Amendment is Personal Protection*

<u>Heller</u> also establishes that "the core lawful purpose" of the Second Amendment is "self-defense," <u>id.</u> at 630, and it does so in several respects.  First and most notable is the Court's resolution of a law that prohibited people from keeping guns in loaded and operable condition.  <u>See</u> <u>id.</u>  The Court's analysis was succinct:  the restriction "makes it impossible for citizens to use [guns] for the core lawful purpose of self-defense and is hence unconstitutional."  <u>Id.</u>  Indeed, in <u>McDonald</u> the Court described <u>Heller</u> as having "held that individual self-defense is 'the *central component*' of the Second Amendment right."  <u>McDonald</u>, 561 U.S. at 767 (quoting

Heller, 554 U.S. at 599) (emphasis in source).  An essential ground of McDonald itself was that "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day. . . ." Id. at 767.  McDonald repeatedly referred to personal protection as the "core" or "central" consideration of the Second Amendment.  See id. at 767-68, 780, 787.

The importance of self-defense also underlay the Court's rejection of the District's argument that it could ban handguns so long as rifles and shotguns were still available.  See Heller, 554 U.S. at 628-29.  The Court of Appeals had rejected this argument on the rationale that "modern handgun[s]" were "lineal descendant[s]" of pistols that had been in use at the time of the Constitution.  See Parker, 478 F.3d at 397-98.  The Supreme Court, in contrast, looked to "common use" during the *present* time to establish a "limit[]" of the right's protection: "weapons not typically possessed by law-abiding citizens for lawful purposes," such as (specifically) "self-defense."  See Heller, 554 U.S. at 624-25 (citing United States v. Miller, 307 U.S. 174 (1939)); see also id. at 627.  The Court thus grounded its rejection of the argument in the handgun's modern utility as "the quintessential self-defense weapon." Id. at 629.  In Caetano, the Court reiterated that the Second Amendment "extends . . . to . . . arms . . . that were not in existence at the time of the founding."  Caetano, 136 S. Ct. at 1028 (quoting Heller, 554 U.S. at 582) (alteration in source).

**B.  Heller's Discussion of Presumptively Lawful Restrictions and Concealed Carry**

Part III of the Heller decision begins with the qualification that "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and then discusses three specific restrictions and limitations:  (1) prohibitions on concealed carry; (2) restrictions the Court described as "presumptively lawful"; and (3) a limitation to arms "'in common use at the time.'" See id. at 626-28 (quoting Miller, 307 U.S. at 179).  While the "in common use" issue has limited direct relevance here (given Heller's recognition that modern handguns are protected

"arms"), the Court's discussion of the other two issues is instructive.  While the Court's discussion of these issues may not be part of the Court's actual holding, it is certainly "considered dicta," which binds courts "almost as firmly as . . . the Court's outright holdings, particularly when . . . a dictum is of recent vintage and not enfeebled by any subsequent statement."  McCoy v. MIT, 950 F.2d 13, 19 (1st Cir. 1991); accord United States v. S. Union Co., 630 F.3d 17, 34 (1st Cir 2010); Rossiter, 357 F.3d at 31 n.3; see also United States v. Jimenez-Beltre, 440 F.3d 514, 517 (1st Cir. 2006) ("effectively binding").

**1. *Restrictions the Court Deemed "Presumptively Lawful"***

The Court qualified that it did not intend to "cast doubt on" three types of laws: "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  Heller, 554 U.S. at 626-27.  In a footnote, the Court described these as "examples" of "presumptively lawful regulatory measures."  See id. at 627 n.26; see also McDonald, 561 U.S. at 786.

The precise import of this passage has given rise to debate between the Courts of Appeals.  First Circuit precedent establishes that these three regulatory examples illustrate "categories of regulations that Heller suggested would be 'presumptively lawful.'"  United States v. Booker, 644 F.3d 12, 24 (1st Cir. 2012).  First Circuit precedent "reserves the possibility" that restrictions deemed "presumptively" lawful may be unconstitutional in specific applications.  See United States v. Torres-Rosario, 658 F.3d 110, 113 (1st Cir. 2011).  A felon may not be completely outside the scope of the Second Amendment's protection, and the First Circuit has also indicated that a person who has been "mentally ill" still enjoys some degree of protection.  See id.; see also United States v. Rehlander, 666 F.3d 45, 48-50 (1st Cir. 2012).  The Fourth and

Seventh Circuits have similarly held open the possibility of as-applied challenges.  See United States v. Smoot, 690 F.3d 215, 221 (4th Cir. 2012); United States v. Williams, 616 F.3d 685, 692 (7th Cir. 2010).  In contrast, the Third and Ninth Circuits construe the subject matter of the "presumptively lawful" restrictions to be wholly outside the scope of Second Amendment protection.  See Jackson v. City & County of San Francisco, 746 F.3d 953, 960 (9th Cir. 2016); United States v. Marzzarella, 614 F.3d 85, 91 (3d Cir. 2010).[6]  Finally, the D.C. Circuit's approach creates a presumption that a "longstanding" regulation does not burden conduct within the scope of the Second Amendment, but an individual can rebut this by showing that the regulation has "more than a de minimis effect upon his right."  See Heller v. District of Columbia, 670 F.3d 1244, 1252-53 (D.C. Cir. 2011) ("Heller II").

### 2.  *Concealed Carry*

The Court wrote that the Second Amendment does not secure "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.  For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  Heller, 554 U.S. at 626 (citations omitted).  The Court's first comment presupposes a right to carry *some* weapons in *some* manners and for *some* purposes, as do the authorities the Court cited—two state supreme court decisions and two historical references to support the statement.  See id.

The first decision is Nunn v. State, 1 Ga. 243 (1846), which concerned a state law that made it illegal to (*inter alia*) "keep or to have about their persons . . . pistols."  Id. at 246 (quoting statute).  The court ruled that "so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of

---

[6] Notably, the Third Circuit has qualified that "conditions and qualifications on the commercial sale of arms" cannot be a "categorical exception" from protection, as a law "*prohibiting* the commercial sale of firearms" would be "untenable."  See Marzzarella, 614 F.3d at 92 n.8 (emphasis added).

his natural right of self-defence, or of his constitutional right to keep and bear arms.  But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void. . . ."  Id. at 251 (emphases omitted).  The court reversed the defendant's conviction because there was no proof he had carried the pistol "in a concealed manner."  Id. The second decision, State v. Chandler, 5 La. Ann. 489 (1850), concerned whether a defendant had been entitled to a jury instruction providing that he had a constitutional right "to carry weapons, either concealed or openly," notwithstanding a state law that prohibited concealed carry.  See id. at 489-90.  The court wrote that the concealed weapon ban "interfered with no man's right to carry arms (to use its words) 'in full open view,' which places men upon an equality.  This is the right guaranteed by the Constitution of the United States. . . ."  Id. at 490.

The Court's other citations were George Chase's edition of The American Students' Blackstone and James Kent's Commentaries on American Law.  See Heller, 554 U.S. at 626. Chase's Blackstone observes that "it is generally held that statutes prohibiting the carrying of concealed weapons are not in conflict with these constitutional provisions, since they merely forbid the carrying of arms in a particular manner, which is likely to lead to breaches of the peace and provoke to the commission of crime, rather than contribute to public or personal defence."  The American Students' Blackstone, 84 n.11 (G. Chase ed. 1884)[7] (emphases omitted).  And James Kent's observation was merely that "it has been a subject of grave discussion, in some of the state courts, whether a statute prohibiting persons, when not on a journey, or as travellers, from wearing or carrying concealed weapons, be constitutional."  2 James Kent, Commentaries on American Law *340, n.2 (O. Holmes ed., 12th ed. 1873) (emphasis omitted), quoted in Heller, 554 U.S. at 618.  Taken together, these authorities reflect

---

[7] See https://babel.hathitrust.org/cgi/pt?id=coo1.ark:/13960/t0ks78m1h;view=1up;seq=112 (last visited Jul. 5, 2016).

the historical understanding that bans on concealed carry were valid so long as the option of open

carry remained available.

Other portions of Heller that address concealed carry also reflect this understanding.  Part

II(D) of the decision, which addresses the Second Amendment's interpretation in post-

ratification sources, cited and discussed Nunn and Chandler, as well as Aymette v. State, 21

Tenn. 154 (1840), on this issue.  See Heller, 554 U.S. at 612-14.  The Court explained that Nunn

had "struck down a ban on carrying pistols openly" and that Chandler had "held that citizens had

a right to carry arms openly."  Id. at 612-13.  As is pertinent here, the Court found that Aymette

had "held that the state constitutional guarantee of the right to 'bear' arms did not prohibit the

banning of concealed weapons."  Id. at 613.

Finally, the Court again brought up the issue in Part IV of its decision, in the course of

explaining why the District of Columbia's handgun prohibition was unconstitutional.  See id. at

629.  The Court cited both Nunn and Andrews v. State, 50 Tenn. 165, 187 (1871), as having

overturned prohibitions on carrying pistols in any manner, and it also cited State v. Reid, 1 Ala.

612, 616-17 (1840).  See Heller, 554 U.S. at 629.  In Andrews, the court had explained that the

legislature "may by a proper law regulate the carrying of this weapon publicly, or abroad," but

that the ban on carrying handguns in any manner "is too broad to be sustained."  Andrews, 50

Tenn. at 187-88.  In Reid, the court had upheld a law that prohibited the concealed carry of

handguns, but permitted their open carry, explaining (in language quoted in Heller) that "[a]

statute which, under the pretence of regulating, amounts to a destruction of the right, or which

requires arms to be so borne as to render them wholly useless for the purpose of defence, would

be clearly unconstitutional."  Reid, 1 Ala. at 616-17.

Significantly, the First Circuit has ruled that both the prohibition and the licensing of concealed weapons are "presumptively lawful" under Heller.  See Hightower v. Boston, 693 F.3d 61, 73-74 (1st Cir. 2013); Rene E., 583 F.3d at 12.

**(II)   FIRST CIRCUIT JURISPRUDENCE
AND THE STANDARD OF REVIEW**

The First Circuit has not issued a ruling that squarely addresses the standards that govern the issuance of licenses to carry handguns in public.  See generally Powell v. Tompkins, 783 F.3d 332, 348 (1st Cir. 2015).  Furthermore, the First Circuit has also not adopted a standard of review that would definitively govern the claim presented here.  In most decisions, the First Circuit has used a means-end approach where (generally stated) the degree of justification that the government must provide depends on the extent of the Second Amendment burden.  See Hightower, 693 F.3d at 74-75; Booker, 644 F.3d at 22-26.  But the First Circuit has twice declined to adopt the framework of "intermediate" and "strict" scrutiny.  See id.; see also United States v. Armstrong, 706 F.3d 1, 8 (1st Cir. 2013).  And on one occasion, the First Circuit reviewed a law by looking exclusively to its historical grounding.  See Rene E., 583 F.3d at 12-16.  Taken together, the First Circuit's decisions provide the analytic approach used in Part III.

In Rene E., the court reviewed 18 U.S.C. § 922(x)(2)-(3), a federal law that (with exceptions) sets a minimum age of 18 to possess handguns.  There, the court examined the contours of other contemporary gun laws, how state courts had treated analogous legal issues, and what historical sources from the eighteenth and nineteenth centuries revealed about the Founders' attitudes.  See Rene E., 583 F.3d at 12-16.  The court upheld the law because it found there was "a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns."  Id. at 12.  Significantly, the court's analysis rested on its assessment of historical evidence, rather than its use of means-end scrutiny.  See id. at 16.

-13-

In its next decision, the First Circuit reviewed 18 U.S.C. § 922(g)(9), which prohibits domestic violence misdemeanants from possessing guns. See Booker, 644 F.3d at 13. There, the court wrote that while historical evidence was "relevant" to a statute's constitutionality, its prior decision in Rene E. did not mean "that a law may only be found constitutional by reference to its historical provenance." Id. at 24 n.15. Instead, the court began by considering how the law at issue compared with Heller's presumptively lawful restrictions. See id. at 22-25. While the domestic violence ban "appears consistent with" the restriction on possession by felons, the court found that "some sort of showing" was still needed to uphold the law. See id. at 25 (citing United States v. Skoien, 614 F.3d 638, 641 (7th Cir. 2010) (en banc)). Furthermore, the court declined to use either "intermediate" or "strict" scrutiny, as urged by the parties, but instead "found it sufficient to conclude, as did the Seventh Circuit, that a categorical ban on gun ownership by a class of individuals must be supported by some form of 'strong showing,' necessitating a substantial relationship between the restriction and an important governmental objective." See id. (quoting Skoien, 614 F.3d at 641). After considering the purposes of the law, the court concluded it "substantially promotes an important government interest in preventing domestic gun violence." Id. at 26. In a later decision on the same law, the First Circuit found it sufficient that "a sufficient nexus exists here between the important government interest and the disqualification of domestic violence misdemeanants like Appellant." Armstrong, 706 F.3d at 8; see also United States v. Carter, 752 F.3d 8, 13 (1st Cir. 2014).

The First Circuit's only ruling that addresses issues related to LTC's is Hightower—and this case provides limited guidance both because it concerned a different issue, and because the substantive parameters of the governing statutes have changed. The injury in that case was the revocation of the plaintiff's "Class A" LTC on the ground that she had made a false statement on

her application form.  See Hightower, 693 F.3d at 70.  The court ruled that the plaintiff only had

standing to assert claims for "the additional benefits granted by an unrestricted Class A license,

over and above those granted by a Class B license"—which were the abilities to carry guns

concealed and to possess "large capacity" handguns, discussed *supra*.  See id. at 71.

Furthermore, the court reasoned that because concealed weapon bans are presumptively lawful,

concealed weapon licensing is also presumptively lawful.  See id. at 73-74 (citing Rene E., 583

F.3d at 12).  Finding that the challenge would fail "whatever standard of scrutiny is used," the

court did not need to adopt a specific standard.  Id. at 74.  It was sufficient to find that the power

to revoke LTC's for misstatements served "a variety of important purposes," as indicated by

analogous state and federal laws and their treatment in other courts.  See id. at 74-75 & n.12.

### (III)   DEFENDANT'S POLICY OF IMPOSING "TARGET & HUNTING" RESTRICTIONS VIOLATES THE RIGHT OF ARMED SELF-PROTECTION

Taken together, the First Circuit's decisions suggest an analytic approach under which a

court should first compare the burden at issue with the "presumptively lawful" restrictions

identified in Heller, as well as with contemporary laws and historical authorities.  See

Hightower, 693 F.3d at 73-74; Booker, 644 F.3d at 22-25; Rene E., 583 F.3d at 12-16.  This

analysis can show, as it did in Rene E., that the law imposes no constitutional burden, or it can

provide a degree of analogy to an acceptable burden, as it did in Booker.  See Booker, 644 F.3d

at 24-25; Rene E., 583 F.3d at 16.  Both Booker and Hightower suggest that the degree of

justification needed turns on the extent of the burden on the Second Amendment right.  See

Hightower, 693 F.3d at 74-75; Booker, 644 F.3d at 25 (quoting Skoien, 614 F.3d at 641).[8]

---

[8] While acknowledging binding Circuit authority, Plaintiffs maintain that text and historical understanding should govern, and that if a "level" of scrutiny is required, it should be "strict."

### A. The "Target & Hunting" Restriction is a Severe Burden

The burden here—a near-complete preclusion on bearing arms for the core purpose of personal protection—is a severe one.  This burden goes far beyond both the restrictions that Heller deemed "presumptively lawful" and the historically accepted limitations of the right, and it is also severe when compared with contemporary state laws.

#### 1.  *Comparison with Heller's Presumptively Lawful Restrictions*

Two of the restrictions that Heller discussed concern the carry of guns:  "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" and "prohibitions on carrying concealed weapons."  See Heller, 554 U.S. at 626.  These are laws that regulate the *place* and *manner* of carry—but which leave people free to carry guns in places and manners that are not proscribed.  The practices at issue here are qualitatively different:  Defendant issued each Plaintiff an LTC that *eliminates* the right to bear arms for the purpose of self-defense in any manner or place—except to the extent it could be said that these LTC's allow Plaintiffs to "bear" arms within the home.  See Moore v. Madigan, 702 F.3d 933, 936 (7th Cir. 2012) ("To speak of 'bearing' arms within one's home would at all times have been an awkward usage.").  And unlike the plaintiff in Hightower, the Plaintiffs here do not have the option to apply for a Class B LTC that would allow non-concealed carry.  Cf. Hightower, 693 F.3d at 84 (noting that plaintiff could still "apply for a Class B license").  As such, this burden is much more severe than a ban on carrying guns in only a particular place or manner.  See Moore, 702 F.3d at 940 ("guns [banned] merely in particular places, such as public schools" are a "lesser burden" than a "blanket prohibition on carrying gun in public [that] prevents a person from defending himself anywhere except inside his home").

### 2.  *Analogous Laws*

Defendant's policy, which deprives Plaintiffs of the right to carry handguns for protection in all places but the home, imposes a substantially more severe burden than most other Americans face if they choose to exercise their right to bear arms.  Aside from Massachusetts, there are only five other states that grant officials discretion to either withhold or place restrictions on licenses to carry handguns.[9]  In the remaining 44 states, qualified adults who meet reasonable conditions are entitled to carry handguns for their protection.  While most of these states require licenses and impose requirements and qualifications, their laws require officials to issue licenses to qualified applicants, and do not give officials discretion to impose restrictions.[10]

### 3.  *Historical Authorities*

A preclusion on bearing arms for self-defense, rather than just a ban on concealment, goes far beyond the scope of the restrictions that courts have historically upheld as being consistent with the right to bear arms.  Aside from <u>Chandler</u> and <u>Reid</u>, *supra*, the Arkansas Supreme Court upheld a concealment prohibition in 1842 because it "inhibits only the wearing of certain arms concealed" and was "simply a regulation as to the manner of bearing."  <u>State v.</u>

---

[9] Cal. Penal Code § 26150(a)(2); <u>id.</u> § 26200; Haw. Rev. Stat. § 134-9(a); Md. Code Ann., Pub. Safety § 5-306(a)(5)(ii); <u>id.</u> § 5-307(b); N.J. Stat. Ann. § 2C:58-4(c), (d); N.Y. Penal L. § 400.00(2)(f).

[10] Thirty-four states issue licenses to carry handguns on nondiscretionary terms.  <u>See</u> Ala. Code § 13A-11-75(a)(1)(a); Ark. Code Ann. § 5-73-309; Colo. Rev. Stat. Ann. § 18-12-203(1); Conn. Gen. Stat. § 29-32b(b); Fla. Stat. Ann. § 790.06(2); Ga. Code Ann. § 16-11-129(d)(4); 30 Ill. Comp. Stat. 66/10(a); Ind. Code Ann. § 35-47-2-3(e); Iowa Code Ann. § 724.7(1); Ky. Rev. Stat. Ann. § 237.110(4); La. Rev. Stat. Ann. § 40:1379.3(A)(1); Mich. Comp. Laws Ann. § 28.422(3); Minn. Stat. § 624.714, subdiv. 2(b); Mo. Ann. Stat. § 571.101(1); Mont. Code Ann. § 45-8-321(1); Neb. Rev. Stat. § 69-2430(3); Nev. Rev. Stat. Ann. § 202.3657(2); N.H. Rev. Stat. Ann. § 159.6(I); N.M. Stat. Ann. § 29-19-4(A); N.C. Gen. Stat. § 14-415.11(b); N.D. Cent. Code § 62.1-04-03(1); Ohio Rev. Code Ann. § 2923.125(D)(1); 21 Okla. Stat. Ann. § 1290.12(A)(12); Or. Rev. Stat. Ann. § 166.291(1); 18 Pa. Cons. Stat. § 6109(e); R.I. Gen. Laws § 11-47-11(a); S.C. Code Ann. § 23-31-215(A); S.D. Codified Laws § 23-7-7; Tenn. Code Ann. § 39-17-1351(b); Tex. Gov't Code § 411.177(a); Utah Code Ann. § 53-5-704(1)(a); Va. Ann. § 18.2-308(D); Wash. Rev. Code Ann. § 9.41.070(1); Wis. Stat. § 175.60(2)(a).  Delaware has a discretionary statute for licensing the carry of concealed handguns, but it does not prohibit carrying handguns in open view.  <u>See</u> 11 Del. Code Ann. §§ 1441-42; <u>In re McIntyre</u>, 552 A.2d 500, 501 n.1 (Del. Super. Ct. 1988).  Nine states do not require licenses at all, although some still issue licenses.  <u>See</u> Alaska Stat. § 18.65.700(a); Ariz. Rev. Stat. § 13-3112(A); Idaho Code Ann. § 18-3302(4)(f); Kan. Stat. Ann. § 75-7c03(a); 25 Me. Rev. Stat. Ann. § 2001-A(2)(A-1); W. Va. Code Ann. § 61-7-3; Wyo. Stat. Ann. § 6-8-104(b); 2016 Miss. H.B. 786, sec. 2, § 45-9-101(24).

Buzzard, 4 Ark. 18, 27 (1842); see also State v. Jumel, 13 La. Ann. 399, 399-400 (1858).

Conversely, prohibitions on carrying guns in any manner, open or concealed, violate the right to

bear arms.  The courts so held in both Nunn and Andrews, *supra*, and courts in the Twentieth

Century have continued to find that complete prohibitions violate state constitutional provisions

securing the right to "bear" arms.  See State ex rel. Princeton v. Buckner, 377 S.E.2d 139, 146,

180 W. Va. 457, 464 (1988) ("the legitimate governmental purpose in regulating the right to bear

arms cannot be pursued by means that broadly stifle the exercise of this right where the

governmental purpose can be more narrowly achieved"); Lakewood v. Pillow, 501 P.2d 744,

745, 180 Colo. 20, 23 (1972) (while the interest in regulating carry is "legitimate and substantial,

that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when

the end can be more narrowly achieved"); Las Vegas v. Moberg, 485 P.2d 737, 438-39, 82 N.M.

626, 628-29 (App. Ct. 1971); In re Brickey, 70 P. 609, 609, 8 Idaho 597, 599 (1902).

## B.  Defendant's Policy Does Not Further Important Governmental Interests

### 1.  *A Burden Must Further a Governmental Interest that is (at least) "Important"*

In the cases presented so far, the First Circuit has generally required the government to

make a "strong showing" that there is a "substantial relationship" or "sufficient nexus" with an

"important" governmental purpose.  See Booker, 644 F.3d at 25 ("a categorical ban on gun

ownership by a class of individuals" requires a "'strong showing'" that there is "a substantial

relationship between the restriction and an important governmental objective" (quoting Skoien,

614 F.3d at 641)); see also Armstrong, 706 F.3d at 8; Hightower, 693 F.3d at 74-75.  Two of the

Seventh Circuit's post-Skoien decisions provide significant guidance regarding the analysis of

burdens on the right to bear arms, and they are appropriate to consult, as the Seventh Circuit has

also eschewed categorical standards of scrutiny, and the First Circuit first adopted its approach to

burden analysis from Seventh Circuit authority.  See Booker, 644 F.3d at 25.

In <u>Ezell v. Chicago</u>, 651 F.3d 684 (7th Cir. 2011), the court concluded that the appropriate level of judicial scrutiny depends on "the relative severity of the burden and its proximity to the core of the right." <u>Id.</u> at 708. A "severe burden . . . will require an extremely strong public-interest justification and a close fit between the government's means and its end." <u>Id.</u> In contrast, "laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified." <u>Id.</u> And in <u>Moore</u>, the court addressed the level of scrutiny that should apply to restrictions on the bearing of arms. Relying on <u>Skoien</u> and <u>Ezell</u>, the court reasoned that the level of judicial rigor would depend on the extent to which a restriction precluded the carry of guns. <u>See</u> <u>Moore</u>, 702 F.3d at 939-40. A prohibition that "prevents a person from defending himself anywhere except inside his home" is a "substantial . . . curtailment of the right of armed self-defense [that] requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment." <u>Id.</u> at 940 (emphasis in source). However, a ban on guns "in particular places, such as public schools" is "a lesser burden, [for which] the state doesn't need to prove so strong a need." <u>Id.</u> A ban on guns in particular places is similar to a ban on felon possession, which does not apply across-the-board, but only to "a class of persons who present a higher than average risk of misusing a gun." <u>Id.</u> (citing <u>Skoien</u>, 614 F.3d 638).

### 2. *Defendant's Policy is Not Adequately Related to Public Safety*

While some requirements—like requirements to obtain training or otherwise demonstrate competence—have an apparent connection to the interest in maintaining public safety, these requirements are not a part of the criteria Defendant uses to decide whether or not to impose a restriction. Rather, Defendant's decision depends on his assessment that an individual's stated reason for requesting an LTC includes a "reason to fear" that he considers adequate. The

connection between this consideration and any bona fide public safety consideration is

tangential—at best.  To the extent that Defendant relies on his assessment of "reason to fear" as

an assessment of one's "need" for self-defense, "the fact that a person can demonstrate a

heightened need for self-defense says nothing about whether he or she is more or less likely to

misuse a gun"—the actual public safety consideration.  See Grace v. District of Columbia, no.

15-2234, 2016 U.S. Dist. LEXIS 64681, *60 (D.D.C. May 17, 2016) (citing Drake v. Filko, 724

F.3d 426, 454 (3d Cir. 2013) (Hardiman, J., dissenting)).

And a tangential connection to public safety like this cannot justify Defendant's policy.

However the standard of review may be articulated, it always requires burdens to substantially

advance—not just relate to—important societal purposes.  See Heller, 554 U.S. at 628 n.27 (the

rational basis test cannot "be used to evaluate the extent to which a legislature may regulate a

specific, enumerated right"); accord Booker, 644 F.3d at 25.  When it comes to the licensure of

constitutional rights, the Supreme Court "ha[s] consistently condemned licensing systems which

vest in an administrative official discretion to grant or withhold a permit upon broad criteria

unrelated to proper regulation of public places." Kunz v. New York, 340 U.S. 290, 294 (1951);

accord Shuttlesworth v. Birmingham, 394 U.S. 147, 153 (1969).  Defendant's policy does not

serve considerations that are proper to the regulation of public places.

**CONCLUSION**

The right to bear arms is the right to carry guns; the core purpose of the right is personal

protection; and the Supreme Court did not limit this right to the home.  These three premises

compel the finding that Defendant's policy is unconstitutional, as constitutional rights cannot be

withheld on the basis of criteria that do not advance important public safety considerations.

Defendant cannot withhold the right to bear arms (or any other right) on his judgment that a

person does not have an adequate "reason" to exercise the right.

Dated: July 8, 2016

Respectfully submitted,

THE PLAINTIFFS,

By their attorneys,

David D. Jensen, Esq.
Admitted *Pro Hac Vice*
DAVID JENSEN PLLC
111 John Street, Suite 420
New York, New York 10038
Tel:  212.380.6615
Fax:  917.591.1318
david@djensenpllc.com

Patrick M. Groulx, Esq.
BBO No. 673394
Grolman LLP
321 Columbus Avenue
Boston, Massachusetts 02116
Tel:  617.859.8966
Fax:  617.859.8903
patrick@grolmanllp.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on 8 July 2016.

/s/ David D. Jensen
David D. Jensen, Esq.