## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JEAN BATTY; EDWARD RUSSO; MATT WOLF; PAUL P. BARNETT; CRAIG VACCA; and COMMONWEALTH SECOND AMENDMENT, INC., | ) ) ) ) ) ) |
| Plaintiffs, | ) CIVIL ACTION NO. ) 1:15-cv-10238-FDS ) ) |
| -against- | ) ) |
| KEN ALBERTELLI, in his official Capacity as Chief of the Winchester Police Department; and WILLIAM TAYLOR, in his Official Capacity as Superintendent of the Lowell Police Department, | ) ) ) ) ) |
| Defendants. | ) ) ) |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT KEN ALBERTELLI'S MOTION FOR JUDGMENT ON THE PLEADINGS OR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**(I)** **PLAINTIFFS DID NOT NEED TO PURSUE STATE-LAW REMEDIES** ..................................... 1

**(II)** **THE SECOND AMENDMENT IS NOT CONFINED TO THE HOME** ......................................... 2

    A.    The Supreme Court Did Not Limit *Heller* or *McDonald* to the Home .................. 2

    B.    The First Circuit Has Not Confined the Second Amendment to the Home ............ 5

    C.    No Federal Appeals Court Has Limited the Right to Bear Arms to the Home ...... 7

**(III)** **DEFENDANT HAS NOT JUSTIFIED HIS LTC RESTRICTION PRACTICE** ............................ 14

**CONCLUSION** ...................................................................................................................... 16

# TABLE OF AUTHORITIES

## CASES

Andrews v. State, 50 Tenn. 165 (1871) ............................................................... 8, 13

Chambers v. Mississippi, 410 U.S. 284 (1973) ........................................................ 3

Chmielinski v. Mass. Office of the Comm'r of Prob., 513 F.3d 309 (1st Cir. 2008).................... 1

District of Columbia v. Heller, 554 U.S. 570 (2008)........................................... *passim*

Drake v. Filko, 724 F.3d 426 (3d Cir. 2013) ...................................................... 11-14

English v. State, 35 Tex. 473 (1871) ......................................................... 8-9, 13

Ezell v. Chicago, 651 F.3d 684 (7th Cir. 2011).......................................................... 5

Fife v. State, 31 Ark. 455 (1876) ............................................................ 8-9, 13

First English Evangelical Lutheran Church v. County of Los Angeles,
   482 U.S. 304 (1987) ............................................................................. 3

Hightower v. Boston, 693 F.3d 61 (1st Cir. 2012) ............................................. 1, 5-6

Kachalsky v. Cacace, 701 F.3d 81 (2d Cir. 2012) ........................................... *passim*

Kachalsky v. Cacace, 817 F. Supp. 2d 235 (S.D.N.Y. 2011), aff'd,
   701 F.3d 81 (2d Cir. 2012).................................................................... 2

Kercado-Melendez v. Aponte-Roque, 829 F.2d 255 (1st Cir. 1987)............................... 2

Martinez-Rivera v. Puerto Rico, 812 F.3d 69 (1st Cir. 2016) ................................... 1

McDonald [v. Chicago, 561 U.S. 742 (2010) ................................................ *passim*

Norman v. State, 159 So. 3d 205 (Fla. Ct. App. 2015)......................................... 14

Nunn v. State, 1 Ga. 243 (1846) ................................................................ 8

Parker v. District of Columbia, 478 F.3d 370 (D.C. Cir. 2007),
   aff'd sub nom. District of Columbia v. Heller, 554 U.S. 570 (2008)......................... 4

Patsy v. Bd. of Regents, 457 U.S. 496 (1983) .................................................. 1

Peruta v. County of San Diego, 742 F.3d 1144 (9th Cir. 2014), vacated
   781 F.3d 1106 (9th Cir. 2015)............................................................ 9, 12-13

Peruta v. County of San Diego, no. 10-56971, 2016 U.S. App. LEXIS 10436
   (9th Cir. Jun. 9, 2016) (en banc) ....................................................... 13-14

State v. Chandler, 5 La. Ann. 489 (1850) ...................................................... 8

State v. Reid, 1 Ala. 612 (1840)............................................................... 8

Stratos v. Dep't of Public Welfare, 387 Mass. 312, 439 N.E.2d 778 (1982) ................... 2

United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011) ................................... 7

<u>Woollard v. Gallagher</u>, 712 F.3d 865 (4th Cir. 2013)..................................................... 11

<u>Yee v. Escondido</u>, 503 U.S. 519 (1992) ................................................................. 4

## S<small>TATUTES</small>

42 U.S.C. § 1983 ........................................................................................... 1-2

Cal. Penal Code § 25400 ........................................................................... 13

Cal. Penal Code § 25850 ........................................................................... 13

Cal. Penal Code § 26150 ........................................................................... 13

Cal. Penal Code § 26155 ........................................................................... 13

Cal. Penal Code § 26350 ........................................................................... 13

D.C. Code § 22-4504 (2008) .................................................................... 4

Md. Code Ann., Crim. Law § 4-203 ...................................................... 11

Md. Code Regs. 29.03.02.03 .................................................................. 11

N.J. Admin. Code 13:54-2.4 ............................................................... 11-12

N.J. Stat. Ann. § 2C:39-5 ........................................................................ 11

N.Y. Penal Law § 265.01 ......................................................................... 7

N.Y. Penal Law § 265.20 ......................................................................... 7

Contrary to Defendant's claim, the Supreme Court did not *limit* the Second Amendment to the home when it granted the relief the plaintiff in District of Columbia v. Heller, 554 U.S. 570 (2008), had requested. Moreover, the Court of Appeals for the First Circuit did not hold that LTC restrictions fall outside the scope of constitutional protection in Hightower v. Boston, 693 F.3d 61 (1st Cir. 2012)—and even if it had, subsequent legislative developments have undermined Hightower's essential rationale. No federal appellate court has held broad preclusions on the bearing of arms in public to be categorically outside the scope of constitutional protection. In short, Defendant falls far short of establishing that his practice of imposing "Target & Hunting" restrictions on LTC's—the rationale of which remains largely undisclosed—falls categorically outside the scope of Second Amendment protection.

## ARGUMENT

### (I) PLAINTIFFS DID NOT NEED TO PURSUE STATE-LAW REMEDIES

It is well established that a plaintiff need not exhaust state remedies before invoking a federal court to review the constitutionality of state action. See, e.g., Patsy v. Bd. of Regents, 457 U.S. 496, 501 (1983); Martinez-Rivera v. Puerto Rico, 812 F.3d 69, 74 (1st Cir. 2016) ("exhaustion is not a precondition to bringing a section-1983 claim in federal court"). Indeed, the First Circuit has ruled that there is "no merit" to the argument that a plaintiff must first "exhaust[] his administrative remedies in the sense of pursuing a further appeal in the state court system" before pursuing a 42 U.S.C. § 1983 cause of action. Chmielinski v. Mass. Office of the Comm'r of Prob., 513 F.3d 309, 314 (1st Cir. 2008).

Defendant's argument (p. 15) that "Plaintiffs have no standing to challenge in the Federal Court, as the action is premature" merely ignores this clearly established legal rule. This remains true notwithstanding Defendant's attempts to characterize the Plaintiffs as "attempt[ing] to avoid

the state process" and "usurping the jurisdiction of the Woburn District Court" (p. 14).

Tellingly, aside from the state law allowing for state court review, Defendant cites no authority

to support its exhaustion claim. "The Supreme Court, however, has held expressly that section

1983 claimants need not avail themselves of state judicial and administrative remedies before

going to federal court." Kercado-Melendez v. Aponte-Roque, 829 F.2d 255, 259 (1st Cir. 1987).

As the Supreme Judicial Court of Massachusetts has itself recognized, § 1983 "provides an

independent remedy for violation of rights protected by Federal law. If such a right is at issue,

the § 1983 remedy is available, even if the State has also provided a means of obtaining relief."

Stratos v. Dep't of Public Welfare, 387 Mass. 312, 316, 439 N.E.2d 778, 783 (1982). There is

no dispute that Defendant's decision to reissue the Plaintiffs restricted LTC's was final, and

hence, Plaintiffs' 42 U.S.C. § 1983 claim is properly before the Court. Cf. Kachalsky v. Cacace,

817 F. Supp. 2d 235, 250-51 (S.D.N.Y. 2011), aff'd, 701 F.3d 81 (2d Cir. 2012) (plaintiff with

restricted handgun license did not need to exhaust state law remedies).

**(II)** **THE SECOND AMENDMENT IS
NOT CONFINED TO THE HOME**

**A.** **The Supreme Court Did Not Limit *Heller* or *McDonald* to the Home**

Defendant argues (p. 17) that Heller "only went so far as to define the individual right

under the Second Amendment to possess a firearm . . . in the home," and that "[n]either Heller or

McDonald [v. Chicago, 561 U.S. 742 (2010)] recognize a right to carry a handgun outside the

sanctuary of the home." But Heller's definition of the right was surely not this constrained. The

Court's *definition*, set forth as the first sentence of the section entitled "Meaning of the Operative

Clause," was as follows:

Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation.

Heller, 554 U.S. at 592.  And absent from this broad definition was any language limiting this right to the home—language the Court has included when it intended to limit the scope of its holdings in the past.  See, e.g., First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 321 (1987) ("We limit our holding to the facts presented[.]"); Chambers v. Mississippi, 410 U.S. 284, 302-03 (1973) ("In reaching this judgment, we establish no new principles of constitutional law. . . . Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.").

Moreover, the "core" of the Second Amendment—personal self-defense—is certainly not a homebound interest, even if its need may be "most acute" in the home.  See Heller, 554 U.S. at 628; see also Pl. Br. pp. 7-8.  And finally, the Court's guidance regarding permissible regulations also plainly recognizes that the right does not cease to exist at the threshold of one's home.  For example, the Court's statement that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are presumptively lawful presupposes the existence of a right to carry guns in public places that are *not* sensitive.  See Heller, 554 U.S. at 626; see also Pl. Br. p. 16.  Furthermore, and as Plaintiffs showed in their moving brief, the historical authorities that upheld bans on concealed weapons—an issue the Court discussed at length—did so on the rationale that people remained free to carry guns in open view.  See Pl. Br. pp. 10-13, 17-18; see also Heller, 554 U.S. at 612-14, 626.

Defendant cites (pp. 16-17) page 635 of the Heller decision to justify its argument that the Court limited the reach of the Second Amendment to the home.  There, at the end of its analysis, the Court set forth the relief it was ordering in the case:

> In sum, we hold that the District's ban on handgun possession in
> the home violates the Second Amendment, as does its prohibition
> against rendering any lawful firearm in the home operable for the
> purpose of immediate self-defense.  Assuming that Heller is not
> disqualified from the exercise of Second Amendment rights, the
> District must permit him to register his handgun and must issue
> him a license to carry it in the home.

Heller, 554 U.S. at 635.  The claim that this *limits* the right to the home is serious a misreading.

The plaintiff in Heller had challenged several provisions of the D.C. Code that collectively prohibited people from keeping or using guns for protection—but he had purposefully limited his claims to concern only the home.  See id. at 575-76.  The D.C. Code provisions that addressed the carry of handguns lent themselves to such a framing.  Section 22-4504(a) contained *two* subparts that prohibited carrying a handgun both "in a place other than the person's dwelling place, place of business, or on other land possessed by the person," as well as at any other location (*e.g.* in the home).  See D.C. Code § 22-4504(a) & (a)(1) (2008); see also Parker v. District of Columbia, 478 F.3d 370, 400 & n.20 (D.C. Cir. 2007), aff'd sub nom. Heller, 554 U.S. 570.  Both subparts provided exceptions in the case of "a license issued pursuant to District of Columbia law."  See D.C. Code § 22-4504(a) & (a)(1) (2008).  Thus, "moving a handgun from room to room in one's own house" was illegal, even if the handgun was lawfully registered, without an additional license to carry.  Parker, 478 F.3d 400.  It was this license, necessary to move a handgun from room to room in his house, that the plaintiff in Heller had sought in his pleadings.  See id.

By ordering the District of Columbia to issue the plaintiff this license, the Court granted the plaintiff *all* of the relief he had requested.  And while the court had no jurisdiction to order *further* relief, its jurisdiction to decide the controversy before it included "every subsidiary question fairly included."  See Yee v. Escondido, 503 U.S. 519, 535 (1992).  Thus, as Plaintiffs showed in their moving papers, Heller's actual holdings go well beyond the relief the Court

actually ordered—as is often the case when the Supreme Court rules.  See Pl. Br. pp. 6-8; see also Ezell v. Chicago, 651 F.3d 684, 701 (7th Cir. 2011) (the relief Heller ordered "was enough to decide the case.").  There is no merit to Defendant's attempt to invert stari decisis by using the relief granted as a basis for limiting the scope of the decision's rationale.

### B.  The First Circuit Has Not Confined the Second Amendment to the Home

Further contrary to Defendant's claim (p. 18), the First Circuit did *not* hold that the imposition of restrictions on LTC's "does not amount to a violation of the Second Amendment" in Hightower v. Boston, 693 F.3d 61 (1st Cir. 2012).  Hightower did not even concern the imposition of restrictions, but instead, the revocation of a license for making false statements on a license renewal form.  See id. at 65.  The court upheld this action, reasoning that the provision of truthful information "serves a variety of important purposes," such as "keeping prohibited persons from possessing firearms."  See id. at 74-75.  And far from holding that the loss of an LTC did not implicate the Second Amendment, the court "assume[d], in Hightower's favor, that she does have some Second Amendment interests arising from the revocation of her license."  Id. at 84.

More important is that the General Court's 2014 amendments to § 131 extensively undermine the reasoning and rationale of Hightower, leaving it with little bearing on the present controversy.  As Plaintiffs explained in their moving brief, the 2014 legislation has prohibited the issuance of "Class B" LTC's since August 13, 2014, and it calls for the elimination of remaining statutory references to "Class B" LTC's in 2021.  See Pl. Br. pp. 2-3 & n.3.  Thus, at the time Defendant imposed restrictions on the LTC's he had previously issued to the Plaintiffs (in January-February 2015), it was *impossible* for the Plaintiffs to request (or for the Defendant to issue) a "Class B" LTC—or any other type of different license that would authorize the possession and use of handguns.  See Pl. Br. pp. 1-3.

This undermines <u>Hightower</u> substantially because <u>Hightower</u> turned to a large degree on the distinctions between "Class A" and "Class B" licenses and the continued availability of a "Class B" license. As Plaintiffs have explained, a "Class B" LTC is an all essential respects a "limited" version of a "Class A" LTC that, in contrast, does not allow the carry of concealed firearms or the possession of "large capacity" handguns. <u>See</u> Pl. Br. pp. 2-3; <u>see also</u> <u>Hightower</u>, 693 F.3d at 71 ("the existence of various firearms licenses for which Hightower could apply and the fact that Hightower has not applied for such licenses do impact the arguments Hightower can properly raise on the merits of her claims"). The plaintiff in <u>Hightower</u> had lost a "Class A" LTC, and the court found that she only had standing to assert claims for "the additional benefits granted by an unrestricted Class A license, over and above those granted by a Class B license." <u>Hightower</u>, 693 F.3d at 71. In the court's analysis, those "additional benefits"—concealed carry and the ability to possess "large capacity" handguns—lessened the extent of the constitutional burden. <u>See id.</u> Most notably, the court reasoned that because prohibitions on concealed carry were "presumptively lawful," so too was the "[l]icensing of the carrying of concealed weapons." <u>Id.</u> at 73-74. In addition, the existence of the "Class B" LTC rendered the constitutional deprivation temporary, rather than permanent, because "if all Hightower wants is to carry a small weapon (the five-round revolver which she had been carrying), she may apply for a Class B license." <u>Id.</u> at 84.

The 2014 amendments eliminate these considerations. Massachusetts has now returned to a system of issuing one, unitary LTC that authorizes the possession of all types of otherwise lawful handguns, as well as their carry in all manners and places not otherwise prohibited. The LTC's that Plaintiffs hold are the necessary—and exclusive—prerequisite for possessing any type of handgun ("large capacity" or not) and for carrying it in any type of manner (concealed or

open).  The loss or restriction of an unrestricted "Class A" LTC is no longer than loss or

restriction of a mere "concealed carry" or "large capacity" license, as a "Class B" LTC can no

longer be obtained.  See Pl. Br. pp. 2-3, 16.

### C.  No Federal Appeals Court Has Limited the Right to Bear Arms to the Home

The various Circuit Courts of Appeals have taken divergent views on the extent of the

right to bear arms in public places—but none of the Circuits has found that the Second

Amendment is limited to the home.  It is true that the Fourth Circuit reasoned that "as we move

outside the home, firearm rights have always been more limited," in United States v.

Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011), as Defendant quotes (pp. 17-18).  But the

generalized statement that a right becomes "more limited" does not mean that the right ceases to

exist, nor can it justify a broad preclusion on exercising the right in a broad swath of places

where its need is likely to arise.  Indeed, Masciandaro did not concern a law that prohibited the

carry of guns everywhere, but instead, a federal law (since amended) that prohibited carrying or

possessing loaded guns in National Parks.  See id. at 459.

Since McDonald, six of the Circuits have issued opinions that addressed laws and

policies that broadly preclude the bearing of arms in public.  While none of these decisions is

directly on-point here, their collective development is instructive.

First is Kachalsky v. Cacace, 701 F.3d 81 (2d Cir. 2012), where the Court of Appeals for

the Second Circuit upheld a New York county's policy of imposing restrictions on handgun

licenses absent a showing that an individual had "a special need for self-protection

distinguishable from that of the general community or of persons engaged in the same

profession."  Id. at 86 (quotation omitted).  This case concerned New York law, which makes it

illegal to possess a handgun anywhere, including within the home, in the absence of a license.

See id. at 85; see also N.Y. Penal Law §§ 265.01(1), 265.20(a)(3).  The only licenses available to

individual private citizens authorize them to "have and possess in his dwelling by a householder" and/or to "have and carry concealed."  See Kachalsky, 701 F.3d at 86; see also N.Y. Penal § 400.00(2)(a), (f).  The Second Circuit reasoned that although Heller and McDonald had "arisen only in connection with prohibitions on the possession of firearms in the home, . . . the Amendment must have *some* application in the very different context of the public possession of firearms."  Kachalsky, 701 F.3d at 89 (emphasis in source).  Furthermore, the court acknowledged that many historical courts had struck down bans that prohibited carrying guns in any manner.  See id. at 90 (citing State v. Reid, 1 Ala. 612 (1840), Nunn v. State, 1 Ga. 243 (1846), and State v. Chandler, 5 La. Ann. 489 (1850)); see also Pl. Br. pp. 10-12, 17-18.  However, the court also found that some other Nineteenth Century court decisions had upheld broad bans on carrying guns "both in a concealed or an open manner."  See Kachalsky, 701 F.3d at 90-91 (citing Fife v. State, 31 Ark. 455 (1876), English v. State, 35 Tex. 473 (1871), and Andrews v. State, 50 Tenn. 165 (1871)).

    Significantly, the authorities the court cited do not appear to actually justify its broad conclusion.  First, the court in Andrews v. State actually found that a ban on carrying all handguns in any manner was "*too broad to be sustained*," although it noted that the legislature "may by a proper law regulate the carrying of this weapon publicly, or abroad."  Andrews, 50 Tenn. at 187-88 (emphasis added); see also Pl. Br. pp. 12, 18.  Significantly, Andrews upheld the legislature's power to completely prohibit only those types of arms that were not "arms in the use of which a soldier should be trained," such as "the rifle of all descriptions, the shot gun, the musket, and repeater."  Andrews, 50 Tenn. at 179.  Similarly, the court in Fife v. State upheld a restriction on carrying "pocket" revolvers in any manner on the rationale that such handguns were not protected because they were "not such as is in ordinary use, and effective as a weapon

of war, and useful and necessary for 'the common defense.'" <u>Fife</u>, 31 Ark. at 461. Moreover,

like the court in <u>Andrews</u>, the <u>Fife</u> court did not uphold a ban on carrying *all* handguns, as it

expressly noted that the state law at issue allowed the carry of larger "army" and "navy"

revolvers. <u>See</u> <u>id.</u> at 460-61. Only the court in <u>English v. State</u> upheld a ban on carrying all

pistols in any manner, and it did so on the rationale that pistols were not "arms" within the

meaning of the Second Amendment. <u>See</u> <u>English</u>, 35 Tex. at 474, 476. Setting aside the fact

that two of these three decisions did not actually uphold broad preclusions on the carry of all

handguns, the fact is that <u>Heller</u>'s rejection of a militia-based reading of the Second Amendment

undermines their conclusion that handguns enjoy only limited or no protection. <u>See</u> <u>Peruta v.</u>

<u>County of San Diego</u>, 742 F.3d 1144, 1156, 1160 (9th Cir. 2014), <u>vacated</u> 781 F.3d 1106 (9th

Cir. 2015); <u>see also</u> Pl. Br. p. 8 (handguns protected because of self-defense value).

In any event, the Second Circuit's conclusion was that the historical record was

somewhat unclear, as "states often disagreed as to the scope of the right to bear arms."

<u>Kachalsky</u>, 701 F.3d at 91. Thus, while the court found that the county's policy required "some

form of heightened scrutiny," strict scrutiny was not warranted. <u>See</u> <u>id.</u> at 94. The court's

ultimate conclusion was that "[r]estricting handgun possession in public to those who have a

reason to possess the weapon for a lawful purpose is substantially related to New York's

interests in public safety and crime prevention" and "is not . . . an arbitrary licensing regime no

different from limiting handgun possession to every tenth citizen." <u>Id.</u> at 98.

Shortly thereafter, the Court of Appeals for the Seventh Circuit overturned Illinois's

prohibition on carrying guns in <u>Moore v. Madigan</u>, 702 F.3d 933 (7th Cir. 2012). The state laws

at issue there prohibited carrying guns in any manner (open or concealed) and made no provision

for licensing. <u>See</u> <u>id.</u> at 934. The court reasoned that because the prohibition "prevents a person

from defending himself anywhere except inside his home" it was a "substantial . . . curtailment of the right of armed self-defense [that] require[d] a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment." Id. at 940 (emphasis in source). The court contrasted a ban on guns "in particular places, such as public schools" as "a lesser burden, [for which] the state doesn't need to prove so strong a need." Id. A ban on guns in particular places was similar to a ban on possession by felons and domestic violence offenders, where the prohibition did not apply across-the-board, but instead to "a class of persons who present a higher than average risk of misusing a gun." Id. (citing United States v. Skoien, 614 F.3d 638 (7th Cir. 2010) (en banc)). Finally, the Seventh Circuit particularly disagreed with the Kachalsky's conclusion that the Second Amendment was more limited outside the home "simply because other provisions of the Constitution have been held to make that distinction." Id. at 941 (citing Kachalsky, 701 F.3d at 94). The court distinguished privacy protections by explaining that "the interest in having sex inside one's home is much greater than the interest in having sex on the sidewalk in front of one's home," but "the interest in self-protection is as great outside as inside the home." Id.; see also id. at 937 ("To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in Heller and McDonald.").

The next appeals court to rule was the Court of Appeals for the Tenth Circuit. See Peterson v. Martinez, 707 F.3d 1197 (10th Cir. 2013). The issue there was the interplay between Colorado state laws that prohibited both the unlicensed carry of concealed weapons and the issuance of licenses to nonresidents, and a City of Denver law that prohibited carrying firearms in any manner (concealed or open) without a state-issued concealed handgun license. See id. at 1202. The court's ruling turned largely on the manner in which the nonresident plaintiffs had

presented their claim.  Because the plaintiff had disavowed any challenge to the Denver ordinance, the court found that the plaintiff only had standing to challenge the state's refusal to issue concealed carry licenses to nonresidents.  See id. at 1208.  And on this point, the Tenth Circuit concluded that the act of carrying a handgun in a concealed manner was categorically outside Second Amendment protection.  See id. at 1211.  However, it is significant that while the Tenth Circuit upheld Colorado's general refusal to issue concealed carry licenses to nonresidents, it also indicated that a complete preclusion would likely violate the right to bear arms.  See id. at 1209 ("By contrast, had Peterson challenged the Denver ordinance [that prohibits open carry], he may have obtained a ruling that allows him to carry a firearm openly while maintaining the state's restrictions on concealed carry.").

The Courts of Appeals for the Third and Fourth Circuits acted next, upholding discretionary licensing schemes in Maryland and New Jersey by relying to a substantial degree on the Second Circuit's historical analysis in Kachalsky.  See Drake v. Filko, 724 F.3d 426, 431 (3d Cir. 2013) ("As the Second Circuit observed in Kachalsky, '[h]istory and tradition do not speak with one voice here.'"); Woollard v. Gallagher, 712 F.3d 865, 880-81 (4th Cir. 2013).  Both Maryland and New Jersey have criminal statutes that broadly prohibit the act of carrying a handgun, in any manner, when away from one's home, business, or property.  See Woollard, 712 F.3d at 868-69; Drake, 712 F.3d at 428; see also Md. Code Ann., Crim. Law § 4-203(a)(1)(i)-(ii); N.J. Stat. Ann. § 2C:39-5(b).  And further, both states only issue licenses to carry handguns to those who meet "need"-based criteria set forth in published regulations.  See Woollard, 712 F.3d at 869-70; Drake, 724 F.3d at 428-29; see also Md. Code Regs. 29.03.02.03(A)(7), (B); N.J. Admin. Code 13:54-2.4(d)(1).  The Maryland regulations looked to the "'nearness' or likelihood" of a threat, whether the threat could be avoided, whether the threat was particular to

the applicant, whether facts supported the presumption of a threat, and the length of time that had passed since the initial threat. See Woollard, 712 F.3d at 870 (and sources therein). The New Jersey regulations considered whether there was "evidence[ of] specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by means other than by issuance of a permit to carry a handgun." Drake, 724 F.3d at 428 & n.2 (quoting N.J. Admin. Code 13:54-2.4(d)(1); other citations omitted).

The Fourth Circuit found that Maryland's standard did not amount to a "rationing system," but instead, that it "strikes an appropriate balance between granting handgun permits to those persons known to be in need of self-protection and precluding a dangerous proliferation of handguns on the streets of Maryland." See Woollard, 712 F.3d at 881. The Third Circuit took a somewhat different course, finding that New Jersey's "justifiable need" standard was *itself* a presumptively lawful, longstanding restriction that (per Third Circuit precedent) fell outside the scope of the Second Amendment. See Drake, 724 F.3d at 429. But see id. at 451 (Hardiman, J., dissenting). In the alternative, the Third Circuit upheld the "need" regulations on the same basic rationale as the Second and Fourth Circuits – as "a means to determine whether the increase in risk and danger borne by the public is justified by a demonstrated risk and danger borne to the person seeking to carry a handgun." Id. at 439 (quotation omitted). Finally, having upheld the laws at issue, both the Third and Fourth Circuits included disclaimers stating that they were not definitively answering the question of whether or how the Second Amendment applies outside the home. See Drake, 724 F.3d at 431; Woollard, 712 F.3d at 876.

The Court of Appeals for the Ninth Circuit is the last federal appellate court to have issued rulings on the issue. In Peruta v. County of San Diego, 742 F.3d 1144 (9th Cir. 2014), vacated 781 F.3d 1106 (9th Cir. 2015), a Ninth Circuit panel ruled that a California county's

"need"-based policy for issuing concealed carry licenses violated the Second Amendment.  See id. at 1179.  In California, three separate statutes criminalize the carrying of handguns in a concealed, loaded, and/or open manner.  See Peruta, 742 F.3d at 1147; see also Cal. Penal Code §§ 25400(a), 25850(a), 26350(a).  And the only license available to the plaintiffs was a license "to carry concealed."  See Peruta, 742 F.3d at 1168; see also Cal. Penal Code §§ 26150(b)(1)-(2), 26155(b)(1)-(2).  Under the county's policy, an applicant needed to show "circumstances that distinguish the applicant from the mainstream and causes him or her to be placed in harm's way."  Peruta, 742 F.3d at 1168 (quoting policy).  "Concern for 'one's personal safety alone [was] not considered good cause.'"  Id. (quoting policy).

The panel found that while concealed carry restrictions were "presumptively lawful," the issue was not concealment per se, but a prohibition on "carrying a weapon in public for the purpose of lawful self-defense in any manner."  Id. at 1170-71 (emphasis in source).  A license to carry concealed, as the only license available to the plaintiffs under state law, was "the least intrusive remedy" for the plaintiffs' injury.  Id. at 1171.  Moving beyond this, the panel rejected the historical analysis that the Second, Third, and Fourth Circuits had relied upon, reasoning (as had Justice Hardiman in his dissent from Drake) that once the decisions in Fife, English, and Andrews are properly analyzed, the historical authorities on the scope of the right to bear arms do "speak with one voice:  states may not destroy the right to bear arms in public under the guise of regulating it."  Id. at 1174; see also Drake, 724 F.3d at 449 (Hardiman, J., dissenting).

An en banc panel took a different view, framing the issue as the "right of a member of the general public to carry concealed firearms in public."  See Peruta v. County of San Diego, no. 10-56971, 2016 U.S. App. LEXIS 10436, *10 (9th Cir. Jun. 9, 2016) (en banc) (emphasis added).  After reviewing a number of pertinent historical authorities, including those discussed

previously and above, the court concluded that "the Second Amendment right to keep and bear arms does not include, in any degree, the right of a member of the general public to carry concealed firearms in public." Id. at *50. By focusing on the particular issue of concealment, the court did "not reach the question whether the Second Amendment protects some ability to carry firearms in public, such as open carry." Id. at *18; see also id. at *19 ("The Second Amendment may or may not protect, to some degree, a right of a member of the general public to carry firearms in public."). And notably, while the en banc panel attempted to harmonize its approach with those taken in Kachalsky, Woollard, and Drake, it could do so only by characterizing these cases as having been concerned with "the carrying of concealed or concealable firearms." See id. at *51. Of course, one notable question this approach raises, but does not answer, is whether a state *must* allow citizens to carry guns in open view, or rather it can instead prohibit open carry in favor of a concealed carry licensing scheme. Compare Norman v. State, 159 So. 3d 205, 225-26 (Fla. Ct. App. 2015) (where state made concealed-carry licenses available on non-discretionary terms, appellant had no right to carry gun in open view), with Kachalsky, 701 F.3d at 90 n.13 (noting that "both Chandler and Reid suggest that open carrying must be permitted" (emphasis in source)).

**(III)  DEFENDANT HAS NOT JUSTIFIED HIS LTC RESTRICTION PRACTICE**

Defendant falls far short of meeting his burden of showing that, as a matter of law, sufficiently important governmental interests necessitate the broad burden he has imposed on the Plaintiffs' right to bear arms. For example, Defendant emphasizes facts suggesting (pp. 6-8) that the Plaintiffs have insufficient experience and training with firearms. But this ignores the fact that Defendant himself testified that training was not a criteria he considered when deciding whether to impose or remove restrictions—as well as the fact that both Plaintiffs have testified

that they would be willing to take additional training in order to obtain unrestricted LTC's.  See Pl. Stmt. of Facts (Doc. No. 57) ¶¶ 21, 44.  Moreover, it ignores the fact that Defendant has disclaimed prior licensure (*i.e.* actual experience carrying a firearm) as a pertinent consideration. Id. ¶ 43.  Put simply, Defendant cannot disavow the importance of training and experience and then point to the Plaintiffs' alleged lack of training and experience to justify the burden he has imposed.

At a more basic level, Defendant's claim disregards the fact that Defendant has kept his practice largely secret.  Defendant has explained that applicants must establish that they have a "reason to fear" that he considers adequate, and that documented victims of assault and harassment may have an adequate reason, as may members of certain occupations.  See id. ¶¶ 37-38.  But Defendant also reserves the right to issue unrestricted LTC's to other, unidentified types of individuals.  Id. ¶ 39.  Moreover, Defendant refuses to otherwise identify "considerations" or "criteria" that govern his decision, as well as to provide applicants with "advice" about what they would need to show to obtain licensure.  Id. ¶¶ 40-41.  Nowhere has Defendant's decision-making process been reduced to writing.  Id. ¶ 42.

That result is that while Defendant asserts (p. 18) that "[t]he purpose of the Local Licensing Authority review is to issue licenses which balances the individual's right to bear arms and the legitimate interest in protecting public safety and preventing crime," there is essentially nothing before the Court to actually test the validity of this assertion.  Surely it can be taken as a given that the general purpose of licensing is "public safety and preventing crime," but this generalized statement of purpose does nothing to explain why Defendant's policy—whatever it is—is actually tailored to serve this purpose.  Likewise, Defendant's assertion (p. 18) that "[n]either Plaintiff in their applications provided reason for seeking the use outside the home"

also falls flat.  Without any explanation of what sort of "reason" would be acceptable, Defendant is in no position to argue that the failure to provide this unknown reason(s) materially and substantially advances a sufficiently important public safety objective.  How?  Instead, lacking objective standards and a clear purpose, Defendant's restrictive practice stands as nothing more than a system for rationing the right to bear arms among Defendant's constituents.

## CONCLUSION

Defendant has not established entitlement to either judgment on the pleadings or summary judgment.  There is no merit to Defendant's claim that Plaintiffs needed to pursue state-law remedies, and the Supreme Court did not limit the right to keep and bear arms to the home in <u>Heller</u> or <u>McDonald</u>.  Moreover, while the various Circuits have taken divergent views on the scope and extent of the right to bear arms in public, none of them has adopted the categorically unprotected view Defendant advances.  Indeed, taken together these decisions counsel a different result here, where the issue is carry in any form, and the limiting criteria is Defendant's subjective opinion, rather than some outside, objective standard.

Dated: August 2, 2016

Respectfully submitted,
THE PLAINTIFFS,
By their attorneys,

David D. Jensen, Esq.
Admitted *Pro Hac Vice*
DAVID JENSEN PLLC
111 John Street, Suite 420
New York, New York 10038
Tel:  212.380.6615
Fax:  917.591.1318
david@djensenpllc.com

Patrick M. Groulx, Esq.
BBO No. 673394
Grolman LLP
321 Columbus Avenue
Boston, Massachusetts 02116
Tel:  617.859.8966
Fax:  617.859.8903
patrick@grolmanllp.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on 2 August 2016.

 /s/ David D. Jensen
David D. Jensen, Esq.